UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____

THOMAS ORAZIETTI,               )

                       )

          Plaintiff,     )

                       )

       v.                )

                       )

YARDE METALS, INC.,        )

                       )

         Defendant.    )

_____)

## COMPLAINT AND JURY DEMAND

## PARTIES

1.     The plaintiff, Thomas Orazietti ("Mr. Orazietti" or the "Plaintiff"), is a male resident of the state of Connecticut, residing at 18 Laurel Avenue, Derby, Connecticut 06418.

2.     The defendant Yarde Metals, Inc. (the "Company" or the "Defendant") is a domestic for-profit corporation doing business in the state of Connecticut.  The Company's principal office is located at 45 Newell Street, Southington, Connecticut 06489.

## JURISDICTION AND VENUE

3.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff has brought a claim pursuant to the Americans with Disabilities Act, 42 U.S.C. ch. 126 § 12101 *et seq.* The court may exercise supplemental jurisdiction over the Plaintiff's state law claims. 28 U.S.C. §1367.

4.     This court has personal jurisdiction over the Defendant because the Defendant is a resident of the State of Connecticut.  Further, the Defendant has engaged in and transacted business in the State of Connecticut, including by managing and/or operating a business in

Connecticut and/or employing the Plaintiff in Connecticut, and Plaintiff's causes of action stem largely from business transactions within the State of Connecticut. Indeed, the Plaintiff was employed by the Defendant in the State of Connecticut, was managed and reprimanded by the Defendant in the State of Connecticut, and was terminated by the Defendant in the State of Connecticut.

## STATEMENT OF FACTS

5.      Mr. Orazietti suffers from Attention Deficit Hyperactivity Disorder ("ADHD") which is an impairment that substantially limits one or more of his major life activities, including, but not limited to, his ability to breath, concentrate, learn, and think. Mr. Orazietti's ADHD also substantially limits the operation of one or more of his major bodily functions, including, but not limited to, Mr. Orazietti's neurological functions.

6.      Mr. Orazietti also suffers from manic obsessions, which is an impairment that substantially limits one or more of his major life activities, including, but not limited to, his ability to concentrate and think. Mr. Orazietti's manic obsessions also substantially limits the operation of one or more of his major bodily functions, including, but not limited to, Mr. Orazietti's neurological functions.

7.      Mr. Orazietti suffered from both his ADHD and manic obsessions during all relevant times, including, but not limited to, throughout his employment with the Defendant.

8.      As such, Mr. Orazietti was at all relevant times disabled under federal law and Connecticut law.

9.      As a symptom of these mental disabilities, Mr. Orazietti suffers from panic attacks. Indeed, these panic attacks caused by Mr. Orazietti's mental disabilities can be so severe

that Mr. Orazietti must separate himself from others and either walk around to calm himself down or sometimes even lie down.

10.     In or around September 2018, Mr. Orazietti was hired by the Company to the position of programmer analyst.

11.     The Company did not know about Mr. Orazietti's disabilities at the time he was hired.

12.     At all relevant times, the Company employed more than 15 employees for each working day in 20 or more calendar weeks during the relevant calendar years.

13.     Throughout his employment with the Company, Mr. Orazietti was qualified for the position of programmer analyst.

14.     Further, throughout his employment, Mr. Orazietti was able to perform the essential functions of his programmer analyst position with and/or without reasonable accommodations.

15.     Indeed, Mr. Orazietti's job performance was regularly lauded by his supervisors.

16.     Accordingly, Mr. Orazietti was a qualified individual with a disability.

17.     The Programmer analyst position occupied by Mr. Orazietti was an exempt (salaried) position and Mr. Orazietti accordingly was not required to clock out when he took breaks, etc.

18.     Indeed, it was accepted practice that Mr. Orazietti and other salaried employees at the Company were largely able to set their own schedules so long as they completed their work.

19.     In fact, other, non-disabled salaried employees periodically left early and otherwise worked irregular hours and were not reprimanded for it.

20.     During the first two months of Mr. Orazietti's employment, Mr. Orazietti would sometimes experience panic attacks from his disabilities at work.  In these situations, Mr. Orazietti would typically take a brief break to walk around and calm himself down.

21.     Although these breaks were short, whenever needed, Mr. Orazietti would stay late in order to make sure he finished all relevant work.

22.     During this time, Mr. Orazietti was not informed of any problems with his work productivity or output. Indeed, there were no problems with his work productivity and output.

23.     In or around December 2018, Marc Rubel ("Rubel"), Mr. Orazietti's manager, reprimanded Mr. Orazietti for the fact that he (Mr. Orazietti) sometimes walked around during working hours.

24.     Rubel is a non-disabled individual and does not suffer from panic attacks.

25.      In response to Rubel's reprimand, Mr. Orazietti disclosed his ADHD and manic obsessions to Rubel and explained that these disabilities cause panic attacks.

26.     Mr. Orazietti further explained that in order to manage his panic attack symptoms, Mr. Orazietti sometimes needed to step away from his desk and walk around in order to calm down.

27.     Mr. Orazietti asked Rubel to allow him (Mr. Orazietti) to continue to step away from his desk when he was suffering a panic attack and likewise walk around intermittently as a reasonable accommodation for Mr. Orazietti's disabilities.

28.     In addition, Mr. Orazietti proposed to Rubel the additional reasonable accommodation of working remotely, as this would likely reduce Mr. Orazietti's panic attacks and reduce any distraction caused by Mr. Orazietti walking around to calm himself down.

29.     Importantly, Rubel noted that Mr. Orazietti was a candidate eligible for working remotely since he (Mr. Orazietti) performed his job at high level and, based on the nature of his job, Company did not need Mr. Orazietti to be in the office the same way that the Company needed certain other employees in the office.

30.     Notably, Company permitted other non-disabled employees to work remotely and, accordingly, permitting Mr. Orazietti to work remotely would not have been an undue burden.

31.     Mr. Orazietti also brought up the possibility of having his (Mr. Orazietti's) desk in a different part of the office that was away from others, since being in a more private setting would likely reduce the frequency and/or severity of his panic attacks.

32.     Mr. Orazietti further proposed an additional accommodation in the form of permitting him to use a dynamic (stand-up) desk, as this would potentially allow Mr. Orazietti to do some amount of walking (or standing/movement) in order to calm himself down while still at his work station.

33.     Although Mr. Orazietti provided several proposed reasonable accommodations, Mr. Orazietti made it clear to Rubel that he would also consider any other reasonable accommodations that would permit him to perform the essential functions of his job.

34.     Rubel agreed that Mr. Orazietti's suggested accommodations were all reasonable accommodations and could be done by Company.

35.     Despite this, Mr. Orazietti's requests for one or more reasonable accommodations was never followed through on, and no accommodations were provided.  Indeed, by not granting the requested accommodations, the Company functionally denied the requested accommodations.

36.     Further, despite not providing any of the proposed accommodations, Rubel and Company failed to engage in a meaningful interactive dialogue with Mr. Orazietti about his accommodation requests.

37.     Shortly after this conversation, when Mr. Orazietti in a meeting with Frank (last name unknown, "Frank")), his supervisor Shawn (last name unknown, "Shawn"), and Rubel, Mr. Orazietti had a panic attack at work due to Frank (last name unknown) accusing Mr. Orazietti of causing Frank anxiety because of Mr. Orazietti sometimes walking around during the workday.

38.     As a result of the panic attack, Mr. Orazietti was in tears and hyperventilating.

39.     Rubel and Shawn came to Mr. Orazietti after he (Mr. Orazietti) had the panic attack to talk about the incident.

40.     In this conversation, Rubel and Shawn mocked and demeaned Frank for having anxiety in the workplace.

41.     This incident showed how Rubel and Shawn disrespected individuals with disabilities and would mock them behind their backs.  Thus, the incident made Mr. Orazietti feel uncomfortable about having a disability and made him further believe that the reasonable accommodations that he had requested from Rubel would be denied.

42.     During the months following this panic attack, Mr. Orazietti continued to raise protected concerns to Rubel, relating his (Mr. Orazietti's) need for reasonable accommodations for his panic attacks and Mr. Orazietti's concerns that Company was not providing such reasonable accommodations.

43.     In or around February 2019, Mr. Orazietti had a further follow-up conversation with Rubel regarding his (Mr. Orazietti's) requested reasonable accommodations, again bringing

up the possibility of working remotely, having Mr. Orazietti's desk in a different part of the office, or having a standing desk.

44.     During this conversation, Rubel reiterated Mr. Orazietti was a candidate eligible for working remotely because his job duties were compatible with such a remote work arrangement and since Mr. Oraziett was performing his job at high level.

45.     In response, Rubel again stated these accommodations were a possibility, but refused to grant the accommodation(s).

46.     Indeed, throughout Mr. Orazietti's employment, none of these requested accommodations were ever granted to Mr. Orazietti.

47.     During the following months, Mr. Orazietti was subjected to several harassing comments from Jose (last name unknown), Mr. Orazietti's non-disabled co-worker, and two non-disabled receptionists, Frank (last name unknown) and Chris Bouchant ("Bouchant").

48.     For example, Jose, Frank, and Bouchant would regularly mock Mr. Orazietti for walking around in order to manage his disability symptoms.

49.     Importantly, after Mr. Orazietti disclosed his disabilities, this harassing and discriminatory behavior only worsened.

50.     Mr. Orazietti raised protected concerns about these harassing comments to Rubel. Indeed, Mr. Orazietti asked Rubel to talk to Jose, Frank and Bouchant about how these harassing comments were creating a hostile work environment for Mr. Orazietti.

51.     In response, Rubel said that he would talk to these people and address the discriminatory and harassing behavior.

52.     Upon information and belief, Rubel failed to follow up on this conversation and Jose, Frank and Bouchant were not reprimanded.

53.     Indeed, the harassment did not stop and Jose, Frank, and Bouchant continued to be employed by the Company.

54.     In addition to being subjected to harassing and discriminatory comments, Mr. Orazietti was also being held to higher standards and treated more harshly than non-disabled coworkers.

55.     For example, as noted above, Mr. Orazietti was reprimanded for walking around the office (which he was doing to manage his disability related symptoms), despite the fact that this did not affect Mr. Orazietti's work output or productivity.

56.     Indeed, Mr. Orazietti's work output and productivity remained satisfactory and, indeed, higher than a number of non-disabled coworkers.

57.     In contrast, other non-disabled coworkers frequently played sudoku and/or solitaire on their computers instead of working and were not reprimanded.

58.     Importantly, these non-disabled coworkers playing sudoku and/or solitaire was equally (if not more) distracting than Mr. Orazietti walking around the office (which he was doing to manage his disability related symptoms).

59.     Indeed, the Company's workplace was relaxed and the Company routinely allowed employees to play games, deal with personal issues, and even leave work, all during the workday.

60.     Furthermore, as noted above, Mr. Orazietti's productivity was higher than a number of these coworkers.

61.     On or around June 3, 2019, Mr. Orazietti had another conversation with Rubel, during which Mr. Orazietti reiterated his requests for reasonable accommodations, including working remotely, moving his desk to a space where it wouldn't be distracting to other co-

workers when he (Mr. Orazietti) was walking around to calm his disability symptoms, or alternatively, having a standing desk.

62.     Shockingly, in response, Rubel stated that working remotely was no longer an option.

63.     Importantly, at this time, two of Mr. Orazietti's non-disabled coworkers (who were in the same position as Mr. Orazietti) were permitted to work remotely.

64.     Alarmed by this clearly disparate treatment, Mr. Orazietti asked Rubel why he (Mr. Orazietti) was not being allowed to also work remotely.

65.     In response, Rubel stated Mr. Orazietti could not work remotely because of "optics."

66.     Mr. Orazietti's other requests for reasonable accommodations were seemingly ignored and/or similarly dismissed.

67.     Indeed, despite a number of proposed accommodations, Rubel simply denied all of the proposed accommodations and failed to engage in an interactive dialogue.

68.     Shortly after this conversation, one of Mr. Orazietti's co-workers, Kevin, told Mr. Orazietti that Jose, who had frequently harassed Mr. Orazietti for walking around, was out to get Mr. Orazietti (seemingly due to Mr. Orazietti's disabilities).

69.     Shocked and on the verge of a panic attack as a result of his disabilities, Mr. Orazietti told Kevin to tell Rubel that he (Mr. Orazietti) was going to walk around in an attempt to control the symptoms of the oncoming panic attack.

70.     Importantly, Mr. Orazietti did not have time to notify Rubel in person as he (Mr. Orazietti) was hyperventilating and needed to get away from his workstation before the panic attack worsened.

71.     Furthermore, Mr. Orazietti could not promptly find Rubel and had to vacate the premises before his panic attack worsened and/or became unmanageable.

72.     Kevin told Mr. Orazietti that he would inform Rubel that Mr. Orazietti had been hyperventilating and needed to get away from his workstation to deal with the symptoms of his panic attack.

73.     Accordingly, Mr. Orazietti reasonably relied on Kevin's statement that he would inform Rubel.

74.     On the way to the other side of the building, Mr. Orazietti called his psychiatrist.

75.     Notably, as there was no private space in the building to have a sensitive conversation with his psychiatrist, Mr. Orazietti walked outside of the building and made his way to his car.

76.     Mr. Orazietti proceeded to have a panic attack while on the phone with his psychiatrist. Mr. Orazietti's psychiatrist informed Mr. Orazietti that he temporarily needed to take a break from everything related to work, as this was exacerbating his disabilities and causing the panic attack.

77.     In keeping with Mr. Orazietti's psychiatrist's advice, Mr. Orazietti turned off his phone so he could treat his disabilities and manage the panic attack.

78.     Mr. Orazietti remained in his car in the Company parking lot for a substantial period while he tried to calm down his panic attack symptoms.

79.     At or around 6:30pm that day, Mr. Orazietti turned his phone back on and found he had a text message from Rubel which stated Mr. Orazietti was suspended from his employment.

80.     Due to the severity of the panic attack, Mr. Orazietti's psychiatrist had set up a psychological evaluation in the hospital for the next morning.

81.     On or around June 4, 2019 (the day after the panic attack), Mr. Orazietti spoke to Rubel by phone in the morning.

82.     During this call, Mr. Orazietti told Rubel that he (Mr. Orazietti) had suffered an extreme panic attack due to his disabilities and was undergoing a psychological evaluation with a psychiatrist.

83.     Mr. Orazietti asked Rubel for the reasonable accommodation of being able to take some limited time off from work to undergo the psychological evaluation and possibly be admitted to the hospital for psychiatric care.

84.     Shockingly, Rubel refused to engage in any meaningful dialogue related to Mr. Orazietti's request for this reasonable accommodation.

85.     The psychological evaluation ended at 11am.

86.     At the end of this psychological evaluation, Mr. Orazietti was instructed to go the hospital for immediate treatment of his mental health issues before he went back to work.

87.     In compliance with the psychiatrist's instructions, Mr. Orazietti went to the hospital, where he was to be admitted for further psychological care.

88.     As Mr. Orazietti was being admitted to the hospital, he received a text from Rubel stating that Mr. Orazietti was terminated, and June 6th was his last day of employment.

89.     Shockingly, Rubel was aware that Mr. Orazietti was in the hospital undergoing a psychological evaluation and potentially being admitted for psychiatric care in relation to Mr. Orazietti's disabilities.

90.     Mr. Orazietti was involuntarily terminated from his position at Company on June 6, 2019.

91.     Mr. Orazietti was terminated due to being at the hospital for treatment related to his disability-related panic attacks.

92.     Mr. Orazietti was not provided the reasonable accommodation that he asked for from the Company, nor did the Company offer any alternative accommodation.  The Company likewise did not engage in any interactive dialogue.

93.     Importantly, Mr. Orazietti was informed he was allegedly terminated for leaving work without permission and for supposedly not informing a supervisor.

94.     Notably, Mr. Orazietti was unable to inform his supervisor of his need to leave due to the sudden onset of a panic attack related to his disabilities.  Furthermore, Mr. Orazietti had attempted to inform Rubel through a coworker.

95.     Upon information and belief, Kevin did indeed inform Rubel that Mr. Orazietti had been suffering from disability symptoms and had needed to take some time to calm down.

96.     In the alternative, even if Rubel was not informed of this by Kevin, Rubel knew that Mr. Orazietti had needed to take some time to manage his (Mr. Orazietti's) disability related symptoms prior to Rubel and/or the Company making the decision to suspend and/or terminate Mr. Orazietti.

97.     Further, Mr. Orazietti had previously requested the reasonable accommodation of being permitted to leave his work station when his disability flared up, which had seemingly been granted and which Mr. Orazietti had utilized frequently in the past.

98.     Furthermore, other, non-disabled coworkers also sometimes were not at their workstations and could not be located for periods of time and were not fired.

99.     Indeed, even if Mr. Orazietti had left work without making any attempt to inform his supervisor, other, non-disabled employees were routinely allowed to manage their own schedules, take long breaks, leave early, and take days off with little or no forewarning.

100.     Furthermore, the Company and/or Rubel had consistently failed to accommodate Mr. Orazietti's disabilities and failed to engage in an interactive dialogue, which worsened Mr. Orazietti's disabilities and/or led to Mr. Orazietti needing to leave early on June 3, 2019.

101.     In addition, the Company did not have a policy and/or requirement requiring Mr. Orazietti or other employees in the same or similar positions to have their phones on and/or for them to otherwise be available at all times.

102.     Notably, the Company also failed to run an adequate investigation to determine whether or not there was actually misconduct.  Indeed, the Company failed to interview Mr. Orazietti and/or failed to take into account Mr. Orazietti's statements before deciding to suspend and/or terminate Mr. Orazietti.

103.     Importantly, upon information and belief, the Company routinely conducts investigations before making the decision to suspend and/or terminate non-disabled employees.

104.     On or around September 17, 2019, Mr. Orazietti timely filed a Charge of Discrimination (the "Charge") with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") and cross-filed with the Equal Employment Opportunity Commission (the "EEOC").

105.     On or around November 12, 2020, Mr. Orazietti received a Release of Jurisdiction letter from the CHRO.

106.     On or around November 13, 2020, Mr. Orazietti received a Right to Sue letter from the EEOC.

107.    This lawsuit is timely filed.


**COUNT I**
**(Discrimination Based on Disability and Failure to Accommodate in Violation of Conn.**
**Gen. Stat. § 46a-60)**
**Plaintiff v. the Defendant**

108.    Plaintiff repeats and re-alleges all paragraphs above and below, as if fully set forth

in this Count.

109.    The Company is an employer under the definitions applicable to Conn. Gen. Stat.

§ 46a-60 because at all relevant times the Company employed three or more persons.

110.    The Plaintiff suffers (and at all relevant times suffered) from ADHD and manic

obsessions, which are impairments that substantially limit one or more of his major life activities,

including, but not limited to, his ability to concentrate and think.  Mr. Orazietti's ADHD and

manic obsessions also substantially limits the operation of one or more of his major bodily

functions, including, but not limited to, Mr. Orazietti's neurological functions.  As such, Mr.

Orazietti has a disability under Conn. Gen. Stat. §46a-60.


111.    At all relevant times, Mr. Orazietti was a qualified employee and was capable of

performing the essential functions of his job with or without one or more reasonable

accommodations.

112.    Mr. Orazietti disclosed his disabilities to the Company, and/or the Company was

aware of Mr. Orazietti disabilities, and/or the Company regarded Mr. Orazietti as disabled.

113.    Mr. Orazietti requested and/or utilized disability-related reasonable

accommodations that would have assisted him in performing the essential functions of his job.

These requested reasonable accommodations included, but were not limited to, working

remotely, being permitted to get up and pace during flareups of his disabilities, a dynamic

(standing) desk, having his office moved to a different location, and/or a temporary leave of absence.

114.    The disability-related accommodations requested by Mr. Orazietti did not pose an undue burden on the Company.

115.    The Company failed to engage in an interactive dialogue and unlawfully denied one or more of Mr. Orazietti's accommodation requests.

116.    The Company, by and through its agents, harassed and discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because Plaintiff is disabled and/or because the Company viewed Plaintiff as disabled.

117.    More specifically, the Company subjected the Plaintiff to adverse actions, including, but not limited to, subjecting Mr. Orazietti to a harassing and hostile work environment, unfair and overly harsh discipline, and the termination of the Plaintiff's employment because of the Plaintiff's disability and/or because the Company viewed the Plaintiff as disabled.

118.    Upon information and belief, the Company replaced Mr. Orazietti with a lesser or similarly qualified, non-disabled employee.

119.    The Company acted with malice and/or with reckless indifference to the state protected rights of Mr. Orazietti.

120.    As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

121.     The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

**COUNT II**
**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**
**Plaintiff v. Defendant**

122.     Plaintiff repeats and re-alleges all paragraphs above and below, as if fully set forth in this Count.

123.     During all relevant times the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12 month period.

124.     The Plaintiff suffers (and at all relevant times suffered) from ADHD and manic obsessions, which are impairments that substantially limit one or more of his major life activities, including, but not limited to, his ability to concentrate and think.  Mr. Orazietti's ADHD and manic obsessions also substantially limits the operation of one or more of his major bodily functions, including, but not limited to, Mr. Orazietti's neurological functions.  As such, Mr. Orazietti is disabled under the ADA.

125.     At all relevant times, Mr. Orazietti was a qualified employee and was capable of performing the essential functions of his job with or without one or more reasonable accommodations.

126.     Mr. Orazietti disclosed his disability to the Company, and/or the Company was aware of Mr. Orazietti's disabilities, and/or the Company regarded Mr. Orazietti as disabled.

127.     Mr. Orazietti requested and/or utilized disability-related reasonable accommodations that would have assisted him in performing the essential functions of his job. These requested reasonable accommodations included, but were not limited to, working remotely, being permitted to get up and pace during flareups of his disabilities, a dynamic (standing) desk, having his office moved to a different location, and/or a temporary leave of absence.

128.     The disability-related accommodations requested by Mr. Orazietti did not pose an undue burden on the Company.

129.     The Company failed to engage in an interactive dialogue and unlawfully denied one or more of Mr. Orazietti's accommodation requests.

130.     The Company, by and through its agents, harassed and discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because Plaintiff is disabled and/or because the Company viewed Plaintiff as disabled.

131.     More specifically, the Company subjected the Plaintiff to adverse actions, including, but not limited to, subjecting Mr. Orazietti to a harassing and hostile work environment, unfair and overly harsh discipline, and the termination of the Plaintiff's employment because of the Plaintiff's disability and/or because the Company viewed the Plaintiff as disabled.

132.     Upon information and belief, the Company replaced Mr. Orazietti with a lesser or similarly qualified, non-disabled employee.

133. The Company acted with malice and/or with reckless indifference to the federally protected rights of Mr. Orazietti.

134. As a direct and proximate result of the Company's violation of the ADA, Mr. Orazietti has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

135. Mr. Orazietti seeks all damages to which he is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

## COUNT III
### (Retaliation in Violation of Conn. Gen. Stat. § 46a-60)
### Plaintiff v. the Defendant

136. Plaintiff repeats and re-alleges all paragraphs above and below, as if fully set forth in this Count.

137. The Plaintiff engaged in protected activity under Conn. Gen. Stat. § 46a-60, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by Defendant due to Mr. Orazietti's disability(ies) and/or accommodation requests; (ii) requesting and/or utilizing reasonable accommodations for disabilities which were intended to allow Mr. Orazietti to perform the essential functions of his job; (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of Defendant to provide disability-

related reasonable accommodations and/or the failure of Defendant to engage in an interactive dialogue related to Mr. Orazietti's disabilities.

138.     The Defendant retaliated against Mr. Orazietti and/or discriminated against Mr. Orazietti for engaging in protected activity under Conn. Gen. Stat. § 46a-60 including, but not limited to, by subjecting Mr. Orazietti to a harassing and hostile work environment, unfair and overly harsh discipline, and the termination of the Plaintiff's employment for pretextual reasons.

139.     The Company acted with malice and/or with reckless indifference to the state protected rights of Mr. Orazietti.

140.     As a direct and proximate result of the Defendant's violations of Conn. Gen. Stat. § 46-60, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

141.     The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

**COUNT IV**
**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**
**Mr. Oseafiana v. Defendant**

142.     Plaintiff repeats and re-alleges all paragraphs above and below, as if fully set forth in this Count.

143.    The Plaintiff engaged in protected activity under the ADA, including, but not limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by Defendant due to Mr. Orazietti's disability(ies) and/or accommodation requests; (ii) requesting and/or utilizing reasonable accommodations for disabilities which were intended to allow Mr. Orazietti to perform the essential functions of his job; (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of Defendant to provide disability-related reasonable accommodations and/or the failure of Defendant to engage in an interactive dialogue related to Mr. Orazietti's disabilities.

144.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Mr. Orazietti's exercising of, or enjoyment of, one or more rights granted by the ADA.

145.    More specifically, the Company subjected Mr. Orazietti to adverse actions, including but not limited to, by subjecting Mr. Orazietti to a harassing and hostile work environment, unfair and overly harsh discipline, and the termination of the Plaintiff's employment for pretextual reasons.

146.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Mr. Orazietti.

147.    As a direct and proximate result of the Company's violation of the ADA, Mr. Orazietti has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

148.    Mr. Orazietti seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), other

monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

WHEREFORE, the Plaintiff, Thomas Orazietti, respectfully requests that this honorable court:

A.  Schedule this matter for trial by jury;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay), which is in excess of fifteen thousand dollars, exclusive of interest and costs;

D.  Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation;

E.  Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

F.  Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.  Award the Plaintiff punitive damages;

H.  Award the Plaintiff his reasonable attorney's fees;

I.  Award the Plaintiff interest and costs;

J.   Award the Plaintiff all other damages to which he is entitled; and

K.   Grant such further relief as is just and equitable.

Respectfully Submitted,

Thomas Orazietti

By his attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date: November 16, 2020                    By:   /s/ Michael R. Varraso

Benjamin J. Wyatt, ct29994
BWyatt@Wyattlegalservices.com

Michael R. Varraso, ct30777
MVarraso@wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868